# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> PEDRO SALAS, ) <br> ) <br> Defendant. ) | No. 12 CR 384 <br><br> Chief Judge Rubén Castillo |

## MEMORANDUM OPINION AND ORDER

On August 16, 2012, Pedro Salas was indicted by a Grand Jury. (R. 54, Indictment.) The indictment alleged that Salas directed a heroin and cocaine trafficking organization that obtained large quantities of the drugs and distributed them to various smaller narcotics distributors. (*Id.* ¶¶ 2-4.) Salas was charged along with four co-defendants: Jesus Fuentes, Sergio Baltazar-Lujano ("Sergio"), Gerardo Baltazar-Lujano ("Gerardo"), and Ester Carrera. Each of his co-defendants pleaded guilty to various counts of the ten-count indictment. Sergio pleaded guilty on June 24, 2013; Gerardo pleaded guilty on July 15, 2013; Carrera pleaded guilty on July 16, 2013; and Fuentes pleaded guilty on July 19, 2013.

The indictment charged Salas with conspiracy to possess with intent to distribute and to distribute 1000 or more grams of heroin and 5 or more kilograms of cocaine in violation of 21 U.S.C. § 846 (Count One); distribution of 1000 or more grams of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Two and Four); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (Count Six); and possession of a firearm with an obliterated serial number in violation of 18 U.S.C. § 922(k) (Count Eight). (*Id.*) On July 17, 2013, Salas entered a guilty plea as to Counts One, Two, and

Four. (R. 211, Min. Entry; R. 212, Plea Decl.) He pleaded not guilty to Counts Six and Eight. (R. 212, Plea Decl.)

On July 31, 2013, Salas voluntarily waived his right to a jury trial and proceeded to a bench trial, which was held on August 5, 2013. (R. 221, Min. Entry.) Having reviewed all of the evidence, its own trial notes, and the testimony of the witnesses to determine the credibility of each witness, the Court concludes that there was not enough evidence to find beyond a reasonable doubt that Salas knowingly possessed the firearms that form the basis of Counts Six and Eight. The Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Criminal Procedure 23(c).

## FINDINGS OF FACT

The Court concludes that the Government established by both direct and circumstantial evidence, as well as reasonable inferences therefrom, the following facts beyond a reasonable doubt. To the extent, if any, that findings of fact, as stated, may be considered conclusions of law, they shall be deemed conclusions of law. Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they shall also be deemed findings of fact.

1. Beginning no later than fall 2011, and continuing until his arrest on May 21, 2012, Salas was engaged in the business of trafficking narcotics. (R. 212, Plea Decl. ¶ 6.) After the heroin and cocaine Salas would distribute were transported to the Chicago area, the narcotics were stored at various stash locations, including an apartment on West Roscoe Street in Chicago where co-defendant Gerardo lived. (Id.) Salas helped to coordinate the delivery of heroin and cocaine to, and the receipt of payments from, co-conspirators, including co-defendants Fuentes and Carrera. (Id.) The cash proceeds from the narcotics sales were stored at various stash

2

locations, including Unit 107 at 1801 South Michigan Avenue in Chicago, where Sergio lived. (*Id.*)

2. Salas was the sole leaseholder of Unit 107, a two-bedroom condominium unit. (Gov't Ex. Lease.) Salas stayed at Unit 107 at least occasionally. When he stayed, he used the master bedroom, which did not lock from the outside. (R. 216, Stipulation 7; Tr. at 97.) Sergio inhabited the second bedroom of Unit 107. (R. 216, Stipulation 7.)

3. Between January 25, 2012, and May 21, 2012, law enforcement officers who were surveilling 1801 South Michigan observed Salas enter or exit the building on six occasions. (R. 216, Stipulation 9.) Officers observed Salas or his vehicle in the proximity of 1801 South Michigan on an additional four occasions during those four months. (*Id.*) Salas was never observed carrying any weapons. (Tr. at 100.)

4. In their surveillance of 1801 South Michigan, agents could not observe the door to Unit 107; they were only able to observe the entrances and exits to the building. (R. 217, Stipulation 9.) Agents did not conduct surveillance at night, and there was no evidence as to the last time Salas stayed at Unit 107 overnight. (Tr. at 8, 88.)

5. On or about April 7, 2012, Salas's organization agreed to supply Fuentes with heroin, and Gerardo delivered more than nine kilograms of heroin to Carrera, Fuentes's mother. (R. 212, Plea Decl. ¶ 6; R. 216, Stipulation 2.) That heroin was "fronted," meaning that it was provided with the understanding that Fuentes would pay for it after he resold it. (R. 212, Plea Decl. ¶ 6.)

6. On May 20, 2012, the organization agreed to supply Fuentes with additional heroin, and Fuentes agreed to bring Salas the money he owed for the previously fronted heroin. (*Id.*) On May 21, 2012, Salas met with Fuentes and Carrera at a parking garage in downtown

3

Chicago. (*Id.*) Salas delivered more than 19 kilograms of heroin to Fuentes and Carrera, who delivered approximately $245,750 in cash to Salas. (*Id.*; R. 216, Stipulation 3.)

7. On May 21, 2012, law enforcement officers observed Salas arrive at Gerardo's residence around 10:00 a.m. (R. 216, Stipulation 9.) Salas entered the residence empty-handed and, after about 15 minutes, exited carrying a large duffle bag that contained over 19 kilograms of heroin. (*Id.*)

8. Approximately 20 minutes later, Salas parked near 1801 South Michigan and entered the building empty-handed. (*Id.*) After about 40 minutes, Salas returned to his vehicle and drove to the parking garage downtown, where he delivered the duffel bag to Fuentes. (*Id.*) Salas was then arrested. At the time of his arrest, he was in possession of keys to the main lobby of 1801 South Michigan and the front door of Unit 107, as well as several drug ledgers. (R. 216, Stipulation 11; Tr. at 63.) Salas was not in possession of any weapons. (Tr. at 19, 100.)

9. On May 21, 2012, law enforcement officers conducted a search of Unit 107 using Sergio's keys to the unit after obtaining Sergio's consent. (R. 216, Stipulation 7; Tr. at 43, 85.)

10. During their search, law enforcement officers recovered the following items, among others, from the kitchen of Unit 107: $169,384 in cash; personal letters between Salas and his girlfriend; receipts and documents related to Salas's car; narcotics packaging supplies (including rubber bands, a vacuum sealer, tape, and plastic wrap); drug ledgers similar to those found on Salas's person at the time of his arrest; a Bank of America document addressed to David Ayala Martinez (Sergio's brother-in-law and Salas's suspected supplier); a money counter; a plastic gun box; six cellular phones; Salas's girlfriend's Mexican consulate identification card; and an airline ticket stub in Salas's name for a return trip to the United States from Mexico on April 2, 2012. (R. 216, Stipulation 7; Tr. at 12-13, 58-67.)

11. During their search, law enforcement officers recovered a Tech 9 millimeter luger ("the luger") with the serial number scratched off and an extended magazine from inside the closed drawer of the nightstand in the master bedroom of Unit 107. (R. 216, Stipulation 7.) Law enforcement officers also recovered from the nightstand Wells Fargo ATM receipts from August 15, 2011, and November 5, 2011, and Chase bank receipts from November 18, 2011, and December 5, 2011. (*Id.*) It is unclear whether those receipts were on top of the nightstand or in the drawer. (*Id.*; Tr. at 73-81, 107-09.) Of the four receipts, only the August 15, 2011 Wells Fargo receipt is connected to an account belonging to Salas. (Tr. at 81.) A cellular phone that was also found in the nightstand drawer was not searched or analyzed. (Tr. at 110.)

12. During their search, law enforcement officers recovered a Marlin model 45 rifle ("the rifle") from behind the door of the closet in the master bedroom of Unit 107, and a pair of shoes and various clothing belonging to Salas from within the closet. (R. 216, Stipulation 7; Tr. at 91-93.)

13. During their search, law enforcement officers recovered the following items from inside the drawer of the dresser in the master bedroom of Unit 107: duct tape; rubber bands; a September 14, 2011 Wells Fargo receipt; drug ledgers similar to those found on Salas's person at the time of his arrest; a manual for the money counter found in the kitchen; and four cellular phones. (R. 216, Stipulation 7; Tr. at 70-73)

14. During their search, law enforcement officers recovered from the second bedroom of Unit 107 two additional guns, three cellular phones, miscellaneous documents in Sergio's name and in David Martinez's name, and $2,041 in cash. (R. 216, Stipulation 7; Tr. at 100-01.)

15. Some of the drug ledgers that were recovered from Unit 107 reflected the transactions Salas discussed with his co-defendants and others in April 2012 phone conversations that the Government recorded. (Tr. at 148-59.)

16. No federal agent or government witness ever observed Salas handle either of the firearms charged in Counts Six and Eight, nor did any agent or witness observe when the firearms were placed in Unit 107. (R. 217, Stipulations 1-4.)

17. The firearms charged in Counts Six and Eight were never tested for fingerprints. (R. 217, Stipulation 10.)

## CONCLUSIONS OF LAW

1. Section 924(c)(1)(A) establishes a mandatory minimum sentence for "any person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm[.]" The Court accepts Salas's guilty plea to Count One of the indictment as proof that Salas committed a drug trafficking crime. As Salas was not carrying a firearm at the time of his arrest, the indictment charged him with unlawful possession of the luger and the rifle in violation of section 924(c)(1)(A). Accordingly, to establish Salas's guilt on Count Six, the Government must prove beyond a reasonable doubt that Salas knowingly possessed a firearm and that his possession of that firearm was in furtherance of the narcotics conspiracy.

2. Section 922(k), in relevant part, criminalizes the possession of "any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce." The parties stipulated that the luger traveled in interstate commerce, (R. 216, Stipulation 6), and that its serial number was obliterated, (R. 216, Stipulation 7). Accordingly, to establish Salas's guilt on

Count Eight, the Government must prove beyond a reasonable doubt that Salas knowingly possessed the luger.

3. The Government must prove knowing possession of the firearms for both Count Six and Count Eight, and the Court conducts these analyses simultaneously.

4. Salas was not in physical possession of any weapons when he was arrested. "But even without proof of actual possession, a defendant may nevertheless be held accountable on a theory of constructive possession if the evidence establishes that he owned or controlled the gun." *United States v. Fouse*, 578 F.3d 643, 650-51 (7th Cir. 2009). "Constructive possession is a legal fiction whereby an individual is deemed to 'possess' contraband items even when he does not *actually* have immediate, physical control of the objects, i.e., the individual 'does not possess them in a literal sense.'" *United States v. Morris*, 576 F.3d 661, 666 (7th Cir. 2009) (quoting *United States v. Windom*, 19 F.3d 1190, 1200 (7th Cir. 1994)). Here, the Government's position is that Salas constructively possessed the luger and the rifle. (Tr. at 169-70.)

5. To establish constructive possession, "the government must prove a nexus between the defendant and the relevant item to separate true possessors from mere bystanders." *Morris*, 576 F.3d at 666 (citing *United States v. Richardson*, 208 F.3d 626, 632 (7th Cir. 2000)). This nexus is typically shown in one of two ways: by demonstrating that the defendant had "exclusive control" over the property where the firearm was found, or, in the absence of exclusive control, by demonstrating that the defendant had a "substantial connection" to the property. *United States v. Griffin*, 684 F.3d 691, 695 (7th Cir. 2012). Mere proximity to contraband is not sufficient to establish constructive possession. *United States v. Reed*, 744 F.3d 519, 526 (7th Cir. 2014). "Instead, the defendant must exercise dominion and control over the item." *Morris*, 576 F.3d at 666; *see also United States v. Katz*, 582 F.3d 749, 752 (7th Cir. 2009)

("Constructive possession may be established by demonstrating that the defendant knowingly had the power and intention to exercise dominion and control over the object, either directly or through others, thus establishing a nexus between himself and the object.").

6. The Seventh Circuit has found constructive possession to exist "when a defendant had a substantial connection to the residence where the firearm and the contraband was found," including when "the contraband was seized at the defendant's residence." *United States v. Quilling*, 261 F.3d 707, 712 (7th Cir. 2001) (internal citations omitted). Salas was the sole leaseholder of Unit 107, although he was not the only occupant. While Salas stipulated that he stayed in the master bedroom when he stayed in Unit 107, for example, Sergio lived in Unit 107 full-time. The Government's own evidence established that many individuals had access to Unit 107.

7. "[W]hen the defendant jointly occupies a residence, proof of constructive possession of contraband in the residence requires the government to demonstrate a 'substantial connection' between the defendant and the contraband itself, not just the residence." *Griffin*, 684 F.3d at 697; *see also Katz*, 582 F.3d at 752 (citing *United States v. Castillo*, 406 F.3d 806, 813 (7th Cir. 2005)). The Government has presented evidence that Salas had some possessions in Unit 107: some clothing and shoes in the closet of the master bedroom, an ATM receipt from nine months ago in the drawer of the master bedroom's nightstand, drug ledgers matching his phone calls, and some personal letters and a ticket stub in the kitchen. But access to the weapons does not demonstrate dominion and control, and a substantial connection to the residence is not the same as a substantial connection to the weapons.

8. Several facts or factual omissions in the record cast reasonable doubt upon Salas's possession of the weapons. The only evidence that connected Salas to the master bedroom were

the clothing in the closet, a drug ledger in the dresser, and the ATM receipt from nine months prior to the arrest, but the Government presented no evidence that Salas had stayed in Unit 107 overnight recently or that he was the only person who stayed in the master bedroom of Unit 107. During the surveillance period between January 2012 and May 21, 2012, Salas was only observed in the area of 1801 South Michigan ten times, a number that seems inconsistent with his actually living there. The Court heard evidence that Salas spent time in Belvidere, Illinois, at his girlfriend's residence. The only personal documents of Salas's that were recovered—a boarding pass from his recent trip to Mexico and letters to and from his girlfriend—were located in the kitchen, not the master bedroom. Additionally, the firearms were hidden in such a way that someone casually entering the room would be unaware of their presence—one would have to open the nightstand drawer or go into the closet and look behind the door to observe the firearms. In light of the evidence regarding his connection to Unit 107, the fact that the guns were not in plain view and the lack of any evidence indicating who placed the firearms in Unit 107 and when that occurred cast doubt upon Salas's knowledge that the guns were present. Salas suggests that someone else—a guest of Sergio's, perhaps David Ayala Martinez—visited the apartment and left his firearms in the master bedroom.

9. In the cases the Government cited, the facts demonstrated a substantial connection between the defendant and the contraband at issue rather than just the location at which the contraband was discovered. In *United States v. Alanis*, for example, the defendant was found to be in constructive possession of the gun recovered from a nightstand next to the defendant's bed with his eyeglasses, clothing, and wallet nearby. 265 F.3d 576, 592 (7th Cir. 2001). This seems factually similar to the case at bar, but there is one key difference: there, the defendant lived at the residence, and the bedroom was undeniably the defendant's bedroom.

10. *United States v. Kitchen*, 57 F.3d 516 (7th Cir. 1995), is more factually similar to the present case. There, the defendant denied living at the residence that was searched (his girlfriend's) and suggested that he lived elsewhere and only stayed overnight with his girlfriend occasionally. *Id.* at 520. The two weapons in the case were discovered in a bedroom, one behind the headboard and the other in a dresser drawer. *Id.* at 519. The bedroom contained both men's and women's clothing, shoes, and toiletries, along with miscellaneous papers and receipts bearing the defendant's name and a gold bracelet with the defendant's nickname. *Id.* at 519-20. The defendant had been observed at the residence "on a number of occasions," had stated that he lived at that address, and had given the phone number of the residence to his acquaintance who set up the drug transaction for which the defendant was arrested. *Id.* at 520. Additionally, there was some evidence that the defendant was responsible for $10,000 worth of repairs on the basement of the residence. *Id.* The Seventh Circuit upheld the jury's verdict against the defendant's sufficiency of the evidence challenge, concluding that based on the evidence presented, "[t]he jury might have determined that [the defendant] lived at the residence and occupied the bedroom where the guns were located." *Id.* at 521.

11. In *Kitchen*, along with the rest of the cases the Government relied on, the Seventh Circuit was reviewing the factual findings of a jury or a district court after the convicted defendant challenged the sufficiency of the evidence. *See, e.g., id.* at 518. "A defendant attacking the sufficiency of the evidence used to convict him faces a nearly insurmountable hurdle," and the evidence is viewed on appeal "in the light most favorable to the government." *Morris*, 576 F.3d at 665-66 (quoting *United States v. Pulido*, 69 F.3d 192, 205 (7th Cir. 1995)) (internal quotation marks omitted). In each of the cases the Government relied on, the Seventh Circuit noted the deference it afforded to the fact-finders' conclusions. *United States v. Brown*,

724 F.3d 801 (7th Cir. 2013) ("a reasonable jury could and . . . doubtless did believe" that the defendant possessed the firearm to facilitate his drug dealing); *United States v. Griffin*, 684 F.3d 691, 694 (7th Cir. 2012) ("To prevail, Griffin must show that no rational trier of fact could have found that the government proved the essential elements of the crime beyond a reasonable doubt."); *Alanis*, 265 F.3d at 591 ("When considering a motion for a new trial based on the sufficiency of the evidence, we grant such a request only if the verdict is against the manifest weight of the evidence." (quoting *Tullis v. Townley Eng'g & Mfg. Co.*, 243 F.3d 1058, 1062 (7th Cir. 2001))); *Kitchen*, 57 F.3d at 520 ("we must uphold the verdict if a rational trier of fact could have found the existence of each element of the crime beyond a reasonable doubt"). Here, however, Salas is not attacking his conviction; he is attempting to avoid conviction. Thus, the burden is on the Government to prove Salas's guilt beyond a reasonable doubt, and the Court does not view the evidence in the light most favorable to the Government. While appeals that were decided with deference to the fact-finders' conclusions offer guidance for the Court's analysis, they do not dictate the outcome of the Court's fact-finding.

12. Although *Kitchen* is somewhat similar to the factual dispute present here, the Court does not conclude that Salas had a substantial connection to the firearms. Unlike the details in *Kitchen*, the evidence presented here does not establish a basis for the Court to infer beyond a reasonable doubt that Salas stayed in the master bedroom of Unit 107 consistently enough that he must have known about the hidden firearms.

13. In a third case the Government relied on, *United States v. Griffin*, 684 F.3d 691 (7th Cir. 2012), the Seventh Circuit found insufficient evidence to uphold the jury's conviction. In that felon-in-possession case, the defendant was living with his parents, and the defendant's father was an avid hunter. *Id.* at 693. A large number of firearms and ammunition were found at

the house: in the parents' bedroom, in the kitchen, on the stairs, and in the basement on top of a pool table and a television. *Id.* at 693-94. In that case, as here, the government presented no evidence that the defendant ever had physical possession of the weapons—his fingerprints were not on the items and no witnesses testified seeing him holding the items. *Id.* at 695. The Seventh Circuit found that the government failed to present evidence that the defendant intended to exercise dominion or control over the guns and that the facts demonstrated a substantial connection between the defendant and the residence, but not between him and the weapons. *Id.* Holding that the evidence was insufficient to support a finding beyond a reasonable doubt that the defendant constructively possessed the guns and ammunition, the court reversed the jury verdict. *Id.* at 695-97. The Government attempted to distinguish *Griffin* from the instant case by arguing that it introduced "all manner of pieces of evidence that connect [Salas] to his bedroom and to his apartment." (Tr. at 187.) But that is not enough. The Court concludes that, as in *Griffin*, the Government has established a substantial connection between Salas and Unit 107, but not between Salas and the firearms recovered from the master bedroom.

14. The evidence presented was inconclusive as to whether the Wells Fargo receipt was on top of the nightstand or in the drawer. The Government contended that the location of the receipt was irrelevant because the nightstand was inches away from the bed and the luger was in the first drawer of the night stand. (Tr. at 188-89.) The Court finds, however, that there is a significant difference in the probative value of a receipt that was found on top of the nightstand, where one could have absent-mindedly emptied his pockets in ignorance of the gun, and the probative value of a receipt that was in the drawer with the luger. This uncertainty would be more significant to the Court's analysis, however, if the receipt linking Salas to the nightstand was more contemporaneous to his arrest. The Government argued that the age of the Wells

Fargo receipt, the only evidence linking Salas to the nightstand, was irrelevant because Salas was carrying the debit card for the same account when he was arrested. (Tr. at 176.) This only proves that Salas had a continuous connection to the account; it does nothing to indicate that he was in the master bedroom recently or that he knew the gun was in the nightstand. Similarly, the fact that Salas's clothing and shoes were in the closet proves to the Court that at some time, Salas stayed in the master bedroom frequently enough to justify hanging his clothes in the closet. The Government argues that "it is reasonable to infer that [Salas] regularly spent time [at Unit 107]. It is reasonable to infer that he would have used and opened the drawers of the only night stand in the bedroom where he stayed and used the closet where his clothes were when he stayed there." (R. 244, Gov't's Rebuttal at 26 n.5.) The Court concurs, and draws both of these inferences. However, the evidence does not prove that Salas stayed in the bedroom recently or that the rifle was in the closet when he put his clothes there and the luger was in the nightstand when he slept there. Because no evidence was presented as to when the firearms were placed in the master bedroom or how recently Salas stayed in the bedroom, the Court cannot find a sufficient basis to draw the inference the Government suggests, which is that Salas constructively possessed the luger and the rifle.

15. The Government argues that the airline ticket stub in the kitchen drawer and the drug ledgers, which were linked to calls Salas made in April 2012, establish that Salas "had both recent and consistent access to the South Michigan Residence." (R. 244, Gov't's Rebuttal at 23-24.) The Court concludes beyond a reasonable doubt that Salas had a substantial connection with Unit 107. Of the linked ledgers, however, only one of them came from the master bedroom, and it was seized from the dresser. (Tr. at 158; Gov't Ex. Search Items.) The presence of Salas's clothing and shoes in the closet, one ATM receipt from nine months prior to the arrest,

and one ledger from the dresser across the room from the firearms do not establish beyond a reasonable doubt that Salas had exclusive control of the master bedroom, nor do they establish a substantial connection between Salas and the firearms.

16. Of course, it would be easy for this Court to speculate that Salas probably knew about the firearms and even used them, but such speculation is not proof beyond a reasonable doubt.

17. The evidence presented does not allow the Court to conclude beyond a reasonable doubt that Salas had the intent to exercise dominion and control over the luger or the rifle. The Government has thus failed to prove the "knowing possession" element of the charges against Salas in Counts Six and Eight.

## CONCLUSION

For the foregoing reasons, the Court finds that the Government's evidence failed to prove beyond a reasonable doubt that Salas is guilty of possessing a weapon in furtherance of a crime under 18 U.S.C. § 924(c)(1)(A) or of possessing a weapon with an obliterated serial number under 18 U.S.C. § 922(k). The Court hereby enters a judgment of not guilty on Counts VI and VIII of the indictment. The Court will proceed to sentence Salas on the counts he stands convicted of on September 3, 2014, at 1:30 p.m.

ENTERED: _____
Chief Judge Rubén Castillo
United States District Court

**Dated: July 14, 2014**